UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cynthia Wilburn Arthur, | ) | Civil Action No. 5:21-cv-1514-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting Commissioner | ) | |
| of Social Security Administration,[1] | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") pursuant

to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and

the applicable law, the court reverses and remands the Commissioner's decision for the reasons

discussed herein.

I.      Relevant Background

    A.      Procedural History

In February 2013, Plaintiff filed for DIB, disabled widow's benefits, and SSI, alleging a

disability onset date of July 1, 2007. Tr. 97, 142, 301-14. Her claims were denied initially, Tr.

143-46, and upon reconsideration, Tr. 195-200, 244-49, and Plaintiff requested a hearing, Tr. 250-

51. On September 4, 2015, a hearing was held before an Administrative Law Judge ("ALJ") and

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew Saul as Defendant in this action.

testimony was taken from Plaintiff, who was represented by counsel, from a witness, and from a vocational expert ("VE"). Tr. 52-96. On October 27, 2015, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 17-44. Plaintiff requested review of the decision from the Appeals Council, Tr. 16, but the Appeals Council denied review on December 23, 2016, Tr. 2-4. Plaintiff brought an action seeking judicial review of the Commissioner's decision in this court, but on the Commissioner's motion, the court remanded this case to the Commissioner, Tr. 754-55.

On remand, a hearing was held on August 9, 2018, at which time Plaintiff filed an amended disability onset date of June 2, 2016. Tr. 1102, 3359-63. Shortly thereafter, on October 5, 2018, the ALJ issued a decision dismissing Plaintiff's DIB and disabled widow's benefits but also finding Plaintiff had been disabled since June 2, 2016, for purposes of her SSI claim. Tr. 776-83. On November 6, 2018, Plaintiff's counsel requested that Plaintiff's case be re-opened since "the local Social Security office ha[d] determined that [Plaintiff] did not qualify for SSI benefits[,]" and the ALJ had "stated [he] would reopen the Title II and widows benefits claims, that we amended our onset to withdraw, if she didn't qualify under Title XVI." Tr. 1180. The matter was re-opened.

On April 9, 2019, Plaintiff filed an amended disability onset date of December 1, 2013. Tr. 1107. Plaintiff appeared and testified at hearings held on April 9, 2019, and October 1, 2019. Tr. 3332-55, 3365-97. Richard Anderson, M.D., an impartial medical expert, and Carey A. Washington, an impartial VE, also testified at the October 1st hearing. However, that hearing was continued to allow Dr. Anderson additional time to review all relevant documents. A subsequent hearing was held on April 9, 2020, at which time Dr. Anderson and Dr. Washington both testified. Tr. 669-712. On May 6, 2020, the ALJ issued a decision finding Plaintiff was not disabled prior to June 1, 2016, but she became disabled on that date. Tr. 627-54. Plaintiff requested review of the

decision from the Appeals Council, Tr. 1071-78, but the Appeals Council denied review on April 26, 2021, Tr. 621-24.

Plaintiff brought the instant action seeking judicial review of the Commissioner's decision in this court in a Complaint filed on May 20, 2021. ECF No. 1.

B.      Plaintiff's Background

Born on June 2, 1961, Plaintiff was 52 years old on her alleged onset date of December 1, 2013. *See* Tr. 301, 303, 632. In her initial Disability Report-Adult form from March 2013, Plaintiff noted that she completed twelfth grade in 1979, but she had not completed any type of specialized training or vocational school. Tr. 347. As her past relevant work ("PRW"), Plaintiff listed detention officer (2001), laborer at staffing agencies (2007-2009), machine operator (1999-2000), and stocker at a restaurant (2002-2007). *Id.* Plaintiff indicated that she stopped working on January 31, 2009, because of her conditions. Tr. 346. Plaintiff indicated that she was 5'2" tall and weighed 150 pounds, and her conditions, which she listed as chronic obstructive pulmonary disease ("COPD"), back problems, hypertension, high blood pressure, panic attacks, depression, and memory problems, caused her pain or other symptoms. *Id.*

C.      Administrative Proceedings

1.      September 4, 2015 Hearing

On September 4, 2015, ALJ Nicholas Walter conducted a hearing in Greenville, South Carolina. Tr. 52-96. Plaintiff was present and represented by counsel. Also present were Penny Revis and Dr. Benson Hecker, an impartial VE. Tr. 52-53. Plaintiff, Ms. Revis, and Dr. Hecker all testified. Tr. 53.

a.      Plaintiff's Testimony

Plaintiff was first questioned by the ALJ. Plaintiff testified she was 5'3" and 180 pounds, but her weight fluctuated by ten to fifteen pounds due to her depression. Tr. 59-60. Plaintiff testified that she lived with Ms. Revis, Ms. Revis's children, and their common grandchildren. Tr. 60-61. Plaintiff testified she did not have a driver's license and had not had one for eight-to-ten years. Tr. 61-62. Plaintiff testified she had received a high school diploma although she indicated "back in those days, I really just got passed on year after year." Tr. 62. She had not remarried since her spouse passed away. *Id.*

Plaintiff testified she had previously worked as a detention officer at a county jail, watching over inmates, but she had her own problems dealing with people, and she was fired for having an open container. Tr. 63-64. She also worked as a cashier at a convenience store, but she had issues with counting the money and interacting with the public. Tr. 65. She worked a temporary job with an employment agency, but she could not remember the job she did. Tr. 65-66. Plaintiff also recalled working for Diversco, but she could not recall what she did there. Tr. 66. When asked if something happened that affected her recall from 2004 through 2007, Plaintiff stated, "I just have a bad memory." *Id.* Around 2009, she worked for Spartan Staffing, but she could not remember that job either. *Id.* From about 2009 through 2012, Plaintiff sat at home with her mother because her mother had cancer, but, according to Plaintiff, her sister did most of the caretaking. Tr. 66-67.

Plaintiff testified she did not feel she could work because of her lungs, feet, legs, shoulders, inability to communicate, inability to focus, and her learning disability. Tr. 67. She had been diagnosed with COPD, which required her to use two different inhalers 10-12 times daily, and she had been hospitalized recently due to complications from her COPD. Tr. 67-68. She testified she experienced shortness of breath with "[a]nything I do, walking, or bathing." *Id.* She testified she smoked occasionally but smoking less had not helped her breathing. Tr. 69. Plaintiff testified she

4

had broken her foot in 2014, and she still had problems when walking, and she still wore a walking boot six or seven times a month. Tr. 69-71. Plaintiff testified that her legs gave out on her three or four times a week. Tr. 71-72. Plaintiff confirmed she had recently had treatment on her shoulder and the ALJ noted she was also wearing a sling at the time of the hearing. Plaintiff stated she had a dislocation, a broken bone, and stretched tendons and ligaments, which she had been told might require surgery. Tr. 72.

When asked how long she could walk before she had to take a break, Plaintiff stated that on the way to the hearing she had gotten out of the car but had to take a break after getting off of the elevator. Tr. 73. She could only walk 10-15 minutes. *Id.* After that, she needed to take a break due to shortness of breath and problems with her legs. Tr. 74. Similarly, she could stand for about ten minutes before her breathing caused issues. *Id.* Plaintiff testified she could only sit for 20-25 minutes before her legs would start to go numb. *Id.* She had experienced such issues for years. *Id.*

Regarding her depression, Plaintiff testified that she cried a lot, and she did not want to be around people, and she could not communicate with people. Tr. 75. She explained she could not communicate with people due to her learning disability. *Id.* Plaintiff testified she was being treated with medication for anxiety and depression. Tr. 75-76. But she still cried a lot and wanted to be alone. Tr. 76.

When asked to describe her typical day, Plaintiff testified, "I get up in the mornings, and I have my pajamas on, and I just sit on the couch, and my mind wanders everywhere. And I just start crying for no reason, walk off." *Id.* Plaintiff testified she could do a few dishes at home, but she could not sweep. Tr. 77. She could not cook because of her memory problems—several times she had started cooking and forgotten about it. *Id.* Plaintiff testified she would have the television on during the day, but she was not able to pay attention to it. *Id.*

Plaintiff was then questioned by her attorney. She affirmed that she had pain in her lower back "[m]ostly all the time." Tr. 78. With regard to her problems with sitting, Plaintiff indicated she had to stop twice on the way to the hearing to get out of the car and walk around. Tr. 79. Plaintiff testified she needed reminders for things because she could not remember. *Id.* She also testified her depression caused suicidal thoughts "[a] lot." *Id.* Plaintiff testified she had panic attacks "all the time[,]" and she was on medication for them. Tr. 79-80. Plaintiff described her panic attacks as follows: "I just get all nervous, and I can't breathe. I feel like I'm dying. You actually feel like you're dying and you cry and you don't want to be around nobody because you don't want nobody to see you going through it." Tr. 80. According to Plaintiff she could not lift five pounds comfortably. Tr. 81. Plaintiff testified she stayed in the house all the time, and Ms. Revis and her daughter ran errands for her. *Id.* Plaintiff testified she previously had a problem with alcohol, but she had stopped drinking four or five months prior. Tr. 80-81. Plaintiff indicated when she drank, she thought it would make her want to be around people, but it never worked. Tr. 81.

Plaintiff testified she had problems with bending, stooping, squatting, twisting, and turning. *Id.* She could only be around people she did not know for two or three minutes before it would be an issue. Tr. 81-82.

b.    Penny Revis's Testimony

Ms. Revis testified that her son and Plaintiff's daughter had two children together. Tr. 83. Plaintiff lived with Ms. Revis at that time. Tr. 84. Ms. Revis had testified that Plaintiff cried often—sometimes for five minutes, sometimes for thirty minutes. *Id.* Plaintiff did not go around the general public often. *Id.* Ms. Revis had noticed Plaintiff's memory issues. *Id.* Plaintiff helped Ms. Revis cook "on her good days[,]" but Ms. Revis had to make sure she turned the oven off because Plaintiff sometimes forgot. Tr. 85. Ms. Revis had been around Plaintiff for twelve years,

6

and during that time, she had noticed Plaintiff's emotional condition and her problems with confusion and understanding getting worse. *Id.* Ms. Revis did not think Plaintiff could live on her own without someone checking in on her. *Id.*

    c.  VE's Testimony

  Dr. Hecker testified Plaintiff had previously worked as a detention officer (DOT 372.667-018), a cashier, light (DOT 211.462-010), and a janitor, medium (DOT 381.687-018). The ALJ had the VE consider a first hypothetical individual with Plaintiff's age, education, and work experience, who was further limited as follows:

> [T]he individual is limited . . . to the light exertional level; never climbing ladders, ropes, or scaffolds; frequent balance; occasional stooping and crouching; frequent kneeling and crawling; no fumes, dust, odors, or other pulmonary irritants; no hazards such as unprotected heights or moving mechanical parts. Further limited to simple, routine, repetitive tasks with no interaction with the public.

Tr. 88. Dr. Hecker testified that individual could not perform Plaintiff's past jobs. *Id.* However, the hypothetical individual could be a packer (DOT 706.684-022, light, SVP 2, 676,000 jobs nationally), an assembler (DOT 706.684-022, light, SVP 2, 229,000 jobs nationally), or a trimmer, hand (DOT 781.687-070, light, SVP 2, 17,000 jobs nationally). Tr. 89.

  In the second hypothetical, the ALJ described the same individual who additionally could only stand/walk for four of eight hours in a workday and could occasionally kneel, crawl, and climb ramps and stairs. *Id.* Dr. Hecker indicated the individual could not perform Plaintiff's past jobs and could perform the other jobs he had offered, but the available jobs would be reduced by about 40 percent. *Id.* Dr. Hecker testified his testimony was consistent with the DOT, except as to the sit-stand limitations, which he based on his own knowledge and research. Tr. 90.

  In hypothetical three, the ALJ asked the VE to consider the individual from the second hypothetical with the additional limitation of sedentary work. *Id.* Dr. Hecker testified Plaintiff

could then perform the jobs of an assembler (DOT 739.684-094, 229,000 jobs nationally), a finisher (DOT 731.687-014, 200,000 jobs nationally), and a sorter (DOT 521.687-086, 410,000 jobs nationally). Tr. 91. He stated his testimony was consistent with the DOT. *Id.*

In hypothetical four, the ALJ asked about whether additional limitations of 20 percent time off task and/or two or more absences a month would preclude work for the previous three hypothetical individuals. *Id.* Dr. Hecker testified that, whether such an individual had both or either of the limitations offered in hypothetical four, work would be precluded. *Id.* Dr. Hecker indicated absences were not covered by the DOT, but he based his answers off of his experience and education. *Id.*

Plaintiff's attorney asked if the available jobs would be further limited if the hypothetical individual was additionally unable to work in proximity or conjunction with other coworkers or supervisors. Tr. 92. Dr. Hecker testified that the minimal interaction with supervisors would have no effect, but the proximity of coworkers would preclude work. *Id.*

### d.    ALJ's 2015 Decision

Following the hearing, the ALJ issued a decision finding Plaintiff had not been under a disability from July 9, 2007, which was then the alleged disability onset date. Tr. 44. The Appeals Council denied Plaintiff's request for review. Tr. 2-4. However, when Plaintiff sought further review in this court, the matter was remanded at the Commissioner's request. Tr. 754-55.

### 2.    August 9, 2018 Hearing

Upon remand, Plaintiff appeared with counsel in Greenville, South Carolina for her administrative hearing on August 9, 2018. Tr. 3357. At that time, Plaintiff moved to amend her disability onset date to June 2, 2016. Tr. 3361. The ALJ accepted the amended onset date and issued a decision dismissing Plaintiff's DIB and disabled widow's benefits while finding Plaintiff

had been disabled since June 2, 2016, for purposes of her SSI claim. Tr. 776-83. The case was subsequently re-opened after Plaintiff was found not to qualify for SSI benefits by the local Social Security office. *See* Tr. 1180.

        3.      April 9, 2019 Hearing

On April 9, 2019, Plaintiff appeared with counsel in front of ALJ Walter in Greenville, South Carolina for an administrative hearing. Tr. 3365. During the hearing, Plaintiff moved to amend the disability onset date to December 1, 2013. Tr. 3369. Both Plaintiff and Janette Clifford, an impartial VE, testified at the hearing. Tr. 3366.

        a.      Plaintiff's Testimony

In response to questions from the ALJ, Plaintiff testified that she was 5'3" and weighed 185 pounds. Tr. 3373. She was widowed and had not remarried. Tr. 3374. She had not done any work since her amended onset date of disability. *Id.*

In response to questions from her attorney, Plaintiff testified she had completed twelfth grade and had graduated from high school, but she had trouble in school. Tr. 3374-75. She stated that she always had trouble focusing and following directions. Tr. 3375. For example, she could read an article but would be unable to recall what it said—"Like if I read, I forget what I read." *Id.* In 2013, Plaintiff testified that the main thing that kept her from working was "COPD, and I just wasn't well." Tr. 3376. She was in and out of the hospital at times. *Id.* At that time, she could not stand and walk for an hour at a time. Tr. 3377. She indicated that in 2013 she could stand and walk for "[m]aybe half an hour." *Id.* She was also affected by depression and anxiety back then. *Id.* Plaintiff testified her depression and anxiety caused her to "shy away from people" and have trouble getting along. Tr. 3378. She got into altercations with friends and family and random people. *Id.* She had trouble sleeping and would only sleep for "three to four hours" a night. Tr.

3379. She testified that in 2013 she could not sit and finish something she started without getting distracted. Tr. 3379-80. Back then she also had thoughts "[she]'d have been better off not around . . . ." Tr. 3380.

In 2013, a regular day for Plaintiff would have been spent at home, watching television. Tr. 3380-81. Plaintiff testified she loved to watch Forensic Files although she would "get lost all the time." Tr. 3381. Plaintiff testified that she cooked a little, but she did not like to cook a lot because she could sometimes start and then walk into another room and forget she was cooking. Tr. 3382. The last time she had set something on fire had been seven years before the 2019 hearing. *Id.* Plaintiff did not drive in 2013 and did not have a license then. Tr. 3383. Plaintiff was living "wherever [she] could" in 2013, and her difficulties interacting with people sometimes caused problems for her living situation. Tr. 3384. She was also taken advantage of by some people. *Id.*

Plaintiff guessed that she could have lifted 15 pounds in 2013. Tr. 3385. Plaintiff testified that she had tried but failed to maintain a bank account on her own in the past. *Id.* According to Plaintiff, she could not handle the pressure of being a detention worker. Tr. 3386. She also had trouble keeping her cash drawer balanced when she worked as a cashier. *Id.* She had to have help with the math required at the end of her shift. *Id.* Plaintiff testified she had suffered panic attacks all of her life, and she was not sure what brought them on, but things like being around people or things not going right could cause them. Tr. 3387. At the time of the April 2019 hearing, Plaintiff was living in a state-run community home. Tr. 3387-88. Throughout her life, Plaintiff had required the assistance of family for things she did not understand. Tr. 3388.

b.    VE's Testimony

The VE described Plaintiff's past work as detention officer and light cashier. Tr. 3391. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past jobs who was limited as follows:

> [L]ight exertional level; never climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, and crouching; no concentrated exposure to pulmonary irritants or to hazards such as unprotected heights or dangerous moving machinery; further limited to simple, routine tasks. Time off-task can be accommodated by normal breaks. The individual can have no customer service interaction with the public, but can have frequent interaction with coworkers or supervisors.

*Id.* The VE testified the hypothetical individual could not perform either of Plaintiff's past jobs as generally performed. *Id.* However, the VE testified the hypothetical individual could perform the jobs of sorter (DOT 521.687-102, light, SVP 1, with 100,706 jobs nationally); garment bagger (DOT 920.687-018, light, SVP 1, with 103,539 jobs nationally); and marker or labeler (DOT 920.687-126, light, SVP 2, with 100,254 jobs nationally). Tr. 3391-92. The VE testified that her answers were based on the DOT, except as to climbing and the customer service/public contact versus contact with coworkers and supervisors, which required answers based on her own training, education, and experience. Tr. 3392.

In a second hypothetical, the ALJ further limited the hypothetical individual to sedentary work, with only the occasional climbing of ramps and stairs and also occasional stooping, kneeling, crouching, and crawling. *Id.* The VE testified Plaintiff could not do either of her past two jobs. *Id.*

In a third hypothetical, the ALJ asked if there was an additional limitation that the individual could not maintain concentration or persistence for two-hour blocks of time on a sustained basis, could she perform past relevant work or any competitive employment. Tr. 3393. The VE answered they could not—"even in unskilled entry level occupations . . . they would need to be able to do that." *Id.*

Plaintiff's counsel asked the VE whether the individual in the first hypothetical could also miss two days of work a month.  Tr. 3393.  The VE indicated that if it happened regularly, the employer would not tolerate it based on her experience—"[i]t's not really a standard across the board type of thing, more of a chronicity issue." Tr. 3394.

4.    October 1, 2019 Hearing

At the hearing held on October 1, 2019 in Greenville, South Carolina before ALJ Walter, Plaintiff was present and represented by counsel. Tr. 3332. Also present were Dr. Anderson, the medical expert, and Dr. Washington, a vocational expert. *Id.*

a.    Plaintiff's Testimony

Upon questioning by the ALJ, Plaintiff confirmed that she lived in a housing authority apartment. Tr. 3343-44. She testified she had previously lived with a woman with whom she had common grandchildren, but she left that home because there was "[t]oo much going on. I couldn't handle it." Tr. 3345. Plaintiff was unsure of her weight but guessed it was 180 or 190 pounds. *Id.* She had not remarried since being widowed. *Id.* Plaintiff confirmed she had graduated high school. Tr. 3346.

In response to questions from her attorney, Plaintiff testified that she had been the payee when her son received her late husband's benefits. Tr. 3346. She had difficulty managing that money. Tr. 3346-47.

b.    Dr. Anderson's Testimony

The ALJ began questioning Dr. Anderson about his resume, qualifications, and review of Plaintiff's file, but Dr. Anderson expressed that he was not sure if there was sufficient objective medical evidence for him to form medical opinions about the nature and severity of Plaintiff's impairments during the relevant time period. Tr. 3347-48. Dr. Anderson indicated he had not

reviewed records from Plaintiff's earlier application. Tr. 3350. The ALJ then ceased questioning Dr. Anderson and indicated he would allow Dr. Anderson time to review more records and then would hold a supplemental hearing. Tr. 3354.

5.    April 9, 2020 Hearing

ALJ Walter held the supplemental hearing on April 9, 2020, by telephone. Tr. 669-71. Plaintiff was present by telephone and represented by counsel. Tr. 669. Also present were Dr. Anderson and Dr. Washington. Tr. 669.

a.    Dr. Anderson's Testimony

Dr. Anderson testified he was a licensed psychologist in Georgia, and he had reviewed Plaintiff's medical records. Tr. 679. When asked if there was "sufficient objective medical or other evidence to allow you to form opinions about the nature and severity of the claimant's medical impairments during the relevant time period[,]" Dr. Anderson responded, "That's unclear." *Id.* However, he declined to have Plaintiff provide additional information at that time. *Id.*

When asked to list Plaintiff's impairments, Dr. Anderson gave a global review of Plaintiff's various diagnoses over the years, noting she had been diagnosed with major depressive disorder, severe; generalized anxiety disorder; panic disorder with agoraphobia; adjustment disorder with anxiety and depression; struggles with attention and concentration; post-traumatic stress disorder; complaints of bipolar and attention deficit and hyperactivity disorder; "probably cognitive disorder, moderate mental deficiency but of questionable validity"; attention and concentration difficulties; major depressive disorder, single episode moderate; and anxiety. Tr. 680-82. Dr. Anderson stated,

> What I feel might be helpful in this case would be to have a neuropsychological evaluation with particular focus on why any failures have occurred, as well as a focus on possible dementia, which I could see as the only explanation for the significant drop in abilities. But again, the evidence is really unclear.

Tr. 682.

As to the cognitive disorder with moderate mental impairment, Dr. Anderson indicated that a full-scale IQ in the 50s was not generally consistent with someone who graduated from high school. Tr. 683. It was also in "conflict with the achievement scores that she produced at the same time as the low IQ." *Id.* Similarly, the low IQ was in conflict with caring for someone with cancer although Dr. Anderson noted Plaintiff had minimized the care she had been able to give her mother. *Id.* Dr. Anderson stated it would be "extremely difficult" to live alone with an IQ of 50. Tr. 683-84.

The ALJ asked Dr. Anderson about notations of Plaintiff's drug-seeking behavior in the record. Tr. 684. Dr. Anderson indicated over-medication for drugs like benzodiazepine could cause slow speech or cognitive impairment, but he did not believe that to be the case for Plaintiff based on his review of Plaintiff's medical timeline. *Id.* Dr. Anderson noted there was cognitive decline noted in earlier records that was not present in later records. Tr. 684-85. He would have expected a cognitive issue to be noted in records from the Mental Health Center in 2015 if major cognitive problems had been present. Tr. 685-86. Dr. Anderson also confirmed that there was no notation by other medical providers (for instance, the doctors who treated Plaintiff for her foot fracture) regarding a cognitive issue. Tr. 686. According to Dr. Anderson, an IQ from 40 to 54 is a moderate functional impairment, an IQ from 55 to 70 is considered mild mental impairment, and an IQ of 25 to 40 is severe mental impairment. Tr. 687. Intellectual disability is any IQ under 70, and an average IQ is 100. *Id.*

Dr. Anderson further indicated he was "troubled by the lack of specific symptoms . . . provided for . . . various diagnoses." Tr. 688. He specifically noted the major depressive disorder, severe, and PTSD diagnoses. *Id.* Dr. Anderson did not think he could give an opinion on the

severity of the B factors due to the lack of supporting evidence and his questions about the credibility of the evidence. *Id.*

Plaintiff's attorney then questioned Dr. Anderson. Dr. Anderson testified that he did not believe someone with an IQ in the 50s could manage financial arrangements for someone else. Tr. 689-90. Dr. Anderson further indicated that Dr. Thompson, who gave Plaintiff the IQ score in the 50s, did not invalidate that score although he questioned the validity of the moderate mental deficiency diagnosis. Tr. 690. Dr. Anderson admitted that both of Dr. Thompson's reports (in 2010 and 2013) noted issues with concentration and persistence, "but he did not seem comfortable with a final diagnosis related to those concerns." Tr. 695. Dr. Anderson also conceded that Dr. Ruffing had noted concerns with Plaintiff's ability to maintain concentration, persistence, and pace. Tr. 696-97. Dr. Anderson stated, "I believe her presentation is fairly consistent in that regard. I guess the questions that remain are the credibility of that presentation." Tr. 697. Dr. Anderson noted there was a lack of specific evidence to support those observations although he admitted the examiners who interviewed Plaintiff would have been in the best position to make those determinations. Tr. 697-98. Dr. Anderson did not know of anything to contradict the conclusions of Dr. Thompson and Dr. Ruffing regarding Plaintiff's issues with concentration, persistence, and pace. Tr. 699.

b.     VE's Testimony

The ALJ asked Dr. Washington about a hypothetical individual, who the ALJ called hypothetical individual five (to preserve continuity with the hypotheticals from the previous hearing), of claimant's age and education with her previous work experience as a detention officer and a cashier, light. Tr. 707. The ALJ included the following additional limitations:

> [T]he individual is limited to the light exertional level, never climbing of ladders, ropes or scaffolds, occasional stooping and crouching, frequent kneeling and

> crawling. No concentrated exposure to pulmonary irritants or to hazards such as
> unprotected heights or dangerous moving machinery. Further, can sustain
> concentration, persistence and pace for periods of two hours at a time with simple,
> routine tasks, can have no customer service interaction with the public, but can have
> frequent interaction with coworkers or supervisors.

Tr. 707-08. Dr. Washington said the hypothetical individual could not perform Plaintiff's past jobs, but the individual could perform the jobs of folder (DOT 583.685-042, light, 150,000 jobs), weigher (DOT 222.387-074, light, SVP 2, 125,000 jobs), and sorter (DOT 361.687-014, light, SVP 2, 125,000 jobs). Tr. 708. The ALJ clarified that there was an additional limitation of no concentrated exposure to pulmonary irritants, and Dr. Washington indicated that did not change his answers. Tr. 709.

In a sixth hypothetical, the ALJ asked if the individual could maintain employment if they also would have three or more absences a month, would have 20 percent time off-task in addition to breaks, or if they could not maintain concentration, persistence, and pace for two-hour blocks of time on a sustained 40-hour-per-week basis. *Id.* Dr. Washington said they could not perform any substantial work on a sustained basis if that were the case. *Id.*

II.    Discussion

A.    The Commissioner's Findings

In the May 6, 2020 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant meets the insured status requirements of the
> Social Security Act through December 31, 2013.
>
> 2.    It was previously found that the claimant is the unmarried
> widow of the deceased insured worker and has attained the age of
> 50. The claimant met the non-disability requirements for disabled
> widow's benefits set forth in section 202(e) of the Social Security
> Act.
>
> 3    The prescribed period ended on July 31, 2014.

4.      The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571, et seq., and 416.971 et seq.).

5.      Since the amended alleged onset date of disability, December 1, 2013, the claimant has had the following severe impairments: spine disorder, arthritis, chronic obstructive pulmonary disorder (COPD), anxiety, depression, and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

6.      The claimant also has the following non-severe impairments: prior foot fracture, fracture, prior dislocation of shoulder, abdominal pain and mild obesity (20 CFR 404.1521 and 416.921).

7.      Since December 1, 2013, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

8.      After careful consideration of the entire record, the undersigned finds that since December 1, 2013, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). In particular, the claimant can lift or carry up to 20 pounds occasionally and 10 pounds frequently. She can stand or walk for approximately 6 hours of an 8-hour workday and sit for approximately 6 hours of an 8-hour workday with normal breaks. The claimant can never climb ladders, ropes or scaffolds, occasionally stoop and crouch, and frequently kneel and crawl. She can have no concentrated exposure to pulmonary irritants or to hazards, such as unprotected heights or dangerous moving machinery. She can sustain concentration, persistence and pace for periods of two hours at a time with simple, routine tasks. She can have no customer service interaction with the public but can have frequent interaction with coworkers and supervisors.

9.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

10.      Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On June 1, 2016, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

11.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

12.    Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

13.    Prior to June 1, 2016, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

14.    Beginning on June 1, 2016, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

15.    The claimant was not disabled prior to June 1, 2016, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

16.    The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).

Tr. 636, 637, 640, 652, 653.

    B.    Legal Framework

        1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

    inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4), § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii), § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526, § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

C.F.R. Subpart P, § 404.1520(a), (b), § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather,

the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff alleges the ALJ committed reversible error, first, by failing properly evaluate the medical opinions in the record and then formulate the residual functional capacity ("RFC") to reflect his assessment of those opinions and, second, by failing to properly account for Plaintiff's moderate limitations in concentration, persistence, and pace. Pl.'s Br. 15-29, ECF No. 10. Plaintiff seeks remand for an award of benefits or, alternatively, remand for further consideration of the issues set forth in her brief. *Id.*

1.    The ALJ's Consideration of the Medical Opinions

Plaintiff argues the ALJ made numerous errors in evaluating the medical opinions offered in her case. First, she asserts the ALJ failed to acknowledge the consistency between the consultative examiners regarding Plaintiff's limitations in concentration, persistence, and pace,

and, further, the ALJ did not acknowledge the examining relationship of the consultative examiners. ECF No. 10 at 18-19.  Plaintiff then asserts that the ALJ found the state agency consultants' opinions were entitled to "great weight" yet did not include a restriction that was part of their opinions.  *Id.* at 19.  Finally, Plaintiff argues the ALJ did not fully evaluate the opinion offered by Dr. Anderson at the hearing.  *Id.* at 19-21. The court finds Plaintiff has identified a reversible error based on the ALJ's consideration of the state agency consultants' opinions. As such, the court focuses on that issue below.

Because Plaintiff's claim was filed before March 27, 2017, the standards for evaluating medical opinion evidence as set forth in 20 C.F.R. §§ 404.1527, 416.927 apply.[3] The regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). For purposes of the regulations, an "acceptable medical source" includes a licensed physician or psychologist. *Id.* §§ 404.1502(a), 416.902(a). The regulations provide that, "[r]egardless of its source," the ALJ "will evaluate every medical opinion" received. *Id.* §§ 404.1527(c), 416.927(c). Generally, the opinions of treating physicians are entitled to greater weight than other evidence. *See id.* §§ 404.1527(c)(2), 416.927(c)(2). The regulations note that treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.*

---

[3] For claims filed on or after March 27, 2017, the regulations changed as to how adjudicators would consider and articulate medical opinions. *See* 20 C.F.R. §§ 404.1520c, 416.920c.

If a treating source's opinion is not given controlling weight, then the following factors must be considered with respect to each medical opinion: (1) examining relationship; (2) treatment relationship, including the length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship; (3) supportability, that is, the evidence presented to support the medical opinion; (4) consistency, that is, how consistent the medical opinion is with the record as a whole; (5) specialization; and (6) other factors. *Id.* §§ 404.1527(c), 416.927(c). "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion. *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021).

The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999) (per curiam) (unpublished) (internal citation and quotation omitted); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In undertaking review of the ALJ's treatment of a claimant's medical sources, the court focuses its review on whether the ALJ's decision is supported by substantial evidence.

a.     The State Agency Consultants' Opinions[4]

---

[4] State agency medical and psychological consultants "are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled." 20 C.F.R. § 404.1527(e)(2)(i), § 416.927(e)(2)(i) (version effective Aug. 24, 2012 to March 26, 2017).

Anna P. Williams, Ph.D., and Craig Horn, Ph.D., evaluated Plaintiff's mental residual functional capacity in the initial disability determination in October 2013 and the reconsideration determination in December 2013, respectively. Tr. 107-09, 174-75. Their opinions are essentially the same. *Id.* As relevant here, both Dr. Williams and Dr. Horn opined Plaintiff was moderately limited in the ability to carry out detailed instructions and the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 108, 174-75. The state agency consultants explained,

> Secondary to [claimant's] mental condition documented on the [psychiatric review technique form], she may have difficulty sustaining her concentration and pace on complex tasks. However, she should be able to attend to and perform tasks without special supervision. *She can attend work regularly, but may miss an occasional day due to her mental condition.* She can relate appropriately to supervisors and co-workers; however, she may be better suited for jobs that do not require regular work with the general public. She can make work-related decisions and occupational adjustments, adhere to basic standards for hygiene and behavior, protect herself from normal work-place safety hazards and use public transportation.

Tr. 108-09, 175 (capitalization removed) (emphasis added).[5]

---

[5] The explanations offered by the state agency consultants in the psychiatric review technique form were also identical. They stated,

> Ms. Arthur has a severe mental impairment [with] her adjustment [disorder with] mixed anxiety and depression; this was [diagnosed] by Dr. Ruffing in 2010 in his psych eval[uation] of that time. This does not give a full understanding of her issues as her statements have clear credibility issues per her recent LPC testing eval[uation with] Dr. Thompson; her testing is not typical of someone [with] a dementia and it is not seen as credible for a person [with] a GED. Dr. Thompson also notes she was vague on acknowledging a DUI as well as appeared to be over-endorsing psych [symptoms]. This is consistent [with] the information in the ALJ [report] dated 1/20/12 in which the ALJ notes a history of drug seeking from her [medical doctor]. Apparently physical MER had indicated a lack of physical basis for some of her complaints of severe pain (also in ALJ [report]). The ALJ's conclusions gave her moderate limitations in all areas, and for the benefit of the doubt the [claimant] is currently given the same assessment. She is capable of engaging in at least unskilled

The ALJ afforded "great weight" to the RFC conclusions reached by the state agency consultants. Tr. 650. As explained by the ALJ,

> Not only does DDS [(State Disability Determination Services)] support a finding of 'not disabled,' their conclusions do not substantially contradict findings by the claimant's treating physicians. Moreover, their assessment is consistent with the claimant's determined residual functional capacity. Specifically, Anna P. Williams, Ph.D. and Craig Horn, Ph.D., DDS's psychological medical consultants, determined the claimant could perform simple work with limited public interaction. This is consistent with the claimant's substantiated objective findings showing some anxiety and depression but essentially normal mood and affect and improvement in symptoms on medication. This is further consistent with the claimant's very conservative mental health treatment and evidence of drug-seeking behavior. Overall, this is consistent with the longitudinal mental health history of the claimant and her daily activities. . . . The record does not support greater limitations than those set forth in the claimant's residual functional capacity.

Tr. 650-51.

> b.     Error by the ALJ

As pointed out by Plaintiff, both state agency consultants opined that Plaintiff "can attend work regularly, but may miss an occasional day due to her mental condition." Tr. 108-09, 175. However, the RFC does not include any limitations regarding Plaintiff's absences. Nor does the narrative discussion otherwise explain to what extent the ALJ believed Plaintiff's mental health impairments would cause her to miss days of work. Instead, the ALJ made the following somewhat conclusory finding:

> The claimant's mental health treatment, her improvement in symptoms with medication, her objective findings, her evidence of noncompliance and drug seeking behavior and taking into consideration the inconsistencies of record, support that the claimant is able to perform simple, routine tasks with no public interaction and frequent interaction with coworkers and supervisors, as consistent with moderate limitations in understanding, remembering and apply information, interacting with others and concentration, persistence and pace.

---

work activities that are not primarily involved [with] the gen[eral] public.

Tr. 103-04, 170 (capitalization removed).

Tr. 647. At the same time, Plaintiff's ability to concentrate, persist, and keep pace during a full workday and for a full workweek was a contested issue in the hearings. For instance, at the April 9, 2019 hearing, Plaintiff's attorney asked if an individual could maintain their employment if they were absent two days a month, and the VE indicated an employer would likely not tolerate that number of absences on a chronic basis. Tr. 3393-94. During the April 9, 2020 hearing, the ALJ asked if an individual could be absent three days a month, and the VE indicated that individual would not be able to maintain employment. Tr. 709.

Despite finding the state agency consultants' opinions entitled to "great weight" the ALJ did not include in the RFC that Plaintiff would miss an "occasional" day due to her mental health issues, nor did the ALJ address how he interpreted that opined limitation by the state agency consultants. The ALJ found the state agency consultants' opinions did "not substantially contradict findings by the claimant's treating physicians." Tr. 650. Indeed, Dr. Emmanuel Yirenkyi, one of Plaintiff's treating physicians,[6] found in August 2011 that Plaintiff would miss one or two days a month due to her impairments. Tr. 3279. However, the ALJ's decision did not recognize Dr. Yirenkyi as a treating physician, and the ALJ afforded Dr. Yirenkyi's opinion "less weight," noting "the opinions as to the claimant's absences and need for breaks is not supported by the record." Tr. 649. Thus, there is some inconsistency within the decision itself. The court would further note that the opined limitation of missing work presumably would have been supported by the findings of multiple consultative experts, who noted Plaintiff had issues with concentration, persistence, and pace. *See* Tr. 474 (finding by Dr. Ron Thompson in 2013 that Plaintiff was not capable of living independently or managing benefits and noting he suspected attention and concentration

---

[6] Of note, the ALJ did not give Dr. Yirenkyi's opinion controlling weight, nor did he apply all of the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c), in discounting Dr. Yirenkyi's opinion. However, Plaintiff has not raised that error in her brief.

deficiencies of unknown etiology), Tr. 3080 (finding by Dr. Stephen Gedo in 2008 that Plaintiff was "disabled for employment" and had "[s]ignificant impairments in memory, concentration, social functioning, energy level, physical mobility, and the ability to sustain a consistent work pace for any type of employment"), Tr. 3089 (finding by Dr. James Ruffing in 2009 that Plaintiff's "ability to focus and attend does appear to be inconsistent and impaired to some degree by her emotional instability. She may tend to decompensate under increasing stress while struggling to manage the concentration, persistence, and pace required in a typical work environment"), Tr. 3158-60 (noting in 2010 examination by Dr. Thompson that Plaintiff was "extraordinarily preoccupied by her physical signs and symptoms" to the point she had "difficulty concentrating on anything else" and further recommending psychological testing, medication, and potential hospitalization for her condition to stabilize).[7]

Ultimately, it is not clear from the decision whether or how the ALJ resolved that Plaintiff's impairments would not result in absences from work, particularly when the ALJ gave "great weight" to an opinion that included Plaintiff would occasionally miss a day of work due to her impairments. Other courts in this district have reversed in similar scenarios—

> The ALJ's RFC cannot be said to be supported by substantial evidence where the court is left to guess how two opinions of non-examining specialists can be assigned great weight by the ALJ and be found by the ALJ to be consistent with the record and then less restrictive RFC limitations are found without explanation by the ALJ or resolving the self-made conflict within the ALJ's opinion itself. While the ALJ is not required to convert exact opinions into an exact RFC, where the ALJ gives

---

[7] It should be noted that the cited reports by consultative examiners were given "some" to "very limited" weight by the ALJ. Tr. 648-50. A primary reason offered for the weight afforded those opinions was that "claimant presented very inconsistently throughout the record. . . ." Tr. 646. In particular, the ALJ perceived a large difference between Plaintiff's presentation to her treating doctors and the consultants who evaluated her. *See* Tr. 648 ("The claimant appears to present inconsistently for consultative evaluations than with her primary care providers."). However, as previously noted, the decision did not recognize Dr. Yirenkyi's opinion and treatment notes as those of a treating physician, and those were more consistent with the opinions and observations by the consultative examiners.

> great weight to an opinion, the ALJ then cannot ignore the opined limitations in
> explaining and formulating the RFC determination. The evaluation of the RFC is
> not in a vacuum apart from the evaluation of the opinion evidence.

*Sprouse v. Saul*, Civil Action No. 4:20-CV-0685-RMG-TER, 2021 WL 1929735, at *4 (D.S.C.

Apr. 28, 2021), *adopted by* 2021 WL 1929370 (D.S.C. May 13, 2021); *see also Lewis v. Saul*,

Civil Action No. 1:19-cv-03457-JMC-SVH, 2020 WL 9848757, at *15 (D.S.C. Oct. 8, 2020)

(finding substantial evidence did not support an ALJ's RFC assessment where the ALJ gave

"considerable weight" to the state agency consultants' opinions but did not include the a restriction

from those opinions and also did not explicitly reject or otherwise indicate consideration of that

restriction), *accepted by* 2021 WL 1961010 (D.S.C. May 17, 2021). *But see Godfrey v. Kijakazi*,

Civil Action No. 6:20-2504-TMC-KFM, 2021 WL 8014681, at *6 (rejecting an argument that an

ALJ must "explain why limitations recommended by medical sources are not adopted when an

ALJ affords those medical sources 'great' or 'considerable' weight" where the new regulations

applied and required the ALJ to assess the persuasiveness of an opinion rather than to give an

opinion a particular weight).

In accordance with SSR 96-8p, in their RFC discussion ALJs "must . . . explain how any

material inconsistencies or ambiguities in the evidence in the case record were considered and

resolved." 1996 WL 374184, at *7 (July 2, 1996). With respect to medical opinions specifically,

"[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must

explain why the opinion was not adopted." *Id.* Throughout her proceedings, Plaintiff has contested

her ability to maintain concentration, persistence, and pace for an eight-hour workday over the

course of a forty-hour workweek. Multiple medical opinions found that Plaintiff would be limited

in her ability to do so, but the ALJ did not sufficiently address those opinions. To be sure, it is

unclear exactly what the state agency consultants meant by their opinion that Plaintiff "can attend

work regularly, but may miss an occasional day due to her mental condition" or how that would translate into the RFC. Tr. 108-09, 175. Nevertheless, it was the ALJ's duty to resolve that ambiguity and explain to what extent, if any, it was considered in his determination of Plaintiff's RFC. He did not do so. *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) ("[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."). For that reason, the court is constrained to remand this matter for further consideration of that issue.

2.      Consideration of Other Issues

Although this matter is being remanded for consideration of Plaintiff's ability to maintain adequate attendance despite the need to miss "an occasional day" as a result of her mental impairments, the Commissioner is to further consider the other allegations of error raised by Plaintiff concerning whether the ALJ adequately considered the other medical opinions offered under the applicable regulations and whether the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence, and pace.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned cannot determine that the Commissioner's decision is supported by substantial evidence.  Plaintiff has requested that the court reverse the Commissioner's decision with instruction to order benefits, noting, in particular, the length of time her claims have been pending and the many proceedings she has gone through to date. Pl. Br. 21, 28. "While the Court certainly has the authority under certain circumstances to reverse and award benefits, the preferred

course is to reverse and allow the Commissioner to address the matter on remand." *Saxon v. Colvin*, No. Civ. A. 6:10-1144-RMG, 2013 WL 4051037, at *4 (D.S.C. Aug. 9, 2013). Because this matter has been pending over nine years and has already been remanded once, the agency is directed to conduct an administrative hearing on remand and to issue a decision by the ALJ within 90 days and a final agency decision within 120 days. Should a further appeal to the district court be necessary, Plaintiff should designate this case as related on the Civil Cover Sheet. Pursuant to the power of the court under sentence four of 42 U.S.C. § 405(g), this matter is hereby reversed and remanded for further administrative proceedings as set forth above.

      IT IS SO ORDERED.

                                    Kaymani D. West

September 26, 2022                             Kaymani D. West
Florence, South Carolina                United States Magistrate Judge